(C. D. 1414)

RICARDO KIFURI *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 12, 1952)

*Greer & Cox* (*R. D. Cox, Jr.,* of counsel); *William Whynman,* associate counsel; for the petitioner.
*Charles J. Wagner,* Acting Assistant Attorney General (*William J. Vitale* and *Samuel D. Spector,* special attorneys), for the respondent.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: This is a petition filed under the provisions of section 489 of the Tariff Act of 1930 seeking remission of additional duties assessed upon certain merchandise invoiced as "Piramid Chewing Gum." The merchandise was packed in 540 cartons, 341 of which each contained 32 packages, and 199, 40 packages, of 50 tablets each. The merchandise was shipped by Ricardo Kifuri of Monterrey, Mexico, to himself at Hidalgo, Tex. It was invoiced at a unit value of $2.45, United States currency, per 100 tablets, c. i. f. duty-paid, and was entered at $2.45, United States currency, less the nondutiable charges, among which was an aforo tax of 10,900 pesos, and less United States customs duties. The appraised value was $2.45, United States currency, per 100 tablets, net, packed, less all of the nondutiable charges, except the aforo tax, less the United States customs duties.

It appears that attempts had been made by the petitioner in this case to import portions of this same merchandise at other ports of the United States upon two different occasions. However, the merchandise had been rejected by the Department of Agriculture (Federal Security Agency, Food and Drug Administration), and in each instance was returned to the exporter.

The court is not here concerned with the rejection of the merchandise by the Federal Security Agency nor with the proper value of the merchandise. When the shipment in question was not allowed entry into this country and was returned to the exporter, the payment of the duties was remitted. However, the additional duties, accruing on account of the undervaluation of the merchandise, were not remitted. The reason why such additional duties were not remitted when the merchandise was not allowed entry is stated upon the entry as "Additional Duties not allowed on exportation because transaction not in good faith."

In his petition, the petitioner alleges that the attempted entry of the merchandise at less valuation than that returned on the final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise.

At the trial, the petitioner testified that he gave all the information he had to the Government agents in connection with making his declaration as to the price and cost of the items entering into same; that he did not withhold anything or attempt to mislead them; and that he always acted in good faith. The witness testified that "aforo tax" meant export tax and represents a tax imposed by the Mexican Government on the exportation of merchandise, and that he paid that tax to the Mexican customs agent who took charge of the goods in Mexico to pass it on to the American side. Not only did the petitioner state that he paid the Mexican customs agent the tax but he also paid him "his commission." After the witness had paid the aforo tax, he was notified by the Mexican customs agent that he needed "one thousand pesos more," and petitioner sent him a check in that amount by wire from Bank LaGuardia, Nuevo Laredo. The witness further testified:

X Q. And how much did you pay him all together?—A. Whatever he——

X Q. For the tax, for the aforo tax?—A. I paid him all together. He present me a note and he say aforo, so much, and for working and for carrying, you know, and for bridge, and all that, and his commission. I pay him all together. Then afterward he sent me and tell me that one thousand pesos more for expenses.

X Q. For what?—A. Expenses, and I sent him a check for expenses. That is all I know.

X Q. And that is not on the invoice?—A. No.

X Q. That extra thousand pesos?—A. No, no, no.

\* \* \* \* \* \* \*

X Q. Did you ever tell any United States Government Customs official that the 10,900 pesos that you had listed as non-dutiable charges, listed as aforo tax, was not actually paid as a tax by you?

\* \* \* \* \* \* \*

A. No; I paid as duty, as export duty, that 10,900 pesos. That means that I pay to the Customs agent to pay as export duty, aforo.

The witness admitted that he did not have a receipt for the money he paid to the Mexican customs, but it appeared that he dealt with the Mexican customs officials through a Mexican customs broker. The broker furnished the petitioner with a list of expenses which did not include the aforo tax. Relative to that tax, no statement was furnished, but the shipper was told what the tax was and he accepted it as a true statement of what he thought was due the Mexican Government; that later, the customs broker told the petitioner he had made a mistake and that one thousand pesos must be paid to complete all the aforo and the expenses and everything, so petitioner sent him one thousand pesos.

Customs Agent Lankford testified for the Government that he made the investigation in connection with the petition in question; that the basis of the levy by way of the additional penalty principally involved the aforo tax; and that the petitioner told him that he did not have a Mexican export permit and, therefore, it was necessary

to pay a larger sum as a "mordida" in order for the merchandise to be exported from Mexico. The witness did not have any discussion with the petitioner about what comprised the sums which had been paid, except for the item of aforo tax "and he told me that he did pay that to the Mexican Customs officials, but it was not paid as a tax." The customs entry officer testified as to the report of the Food and Drug Administration on the analysis of the chewing gum.

Examiner Williams testified concerning a conversation with the petitioner's son and what he had told the witness about the tax in question. It does not appear that petitioner's son had any personal knowledge of the transaction; and he was not called by the Government to testify. We are reluctant, therefore, to accord much weight to such conversation. The witness further testified that upon rejection of merchandise from entry, all taxes are refunded and additional duties do not accrue unless there is a showing of bad faith.

The petitioner, Ricardo Kifuri, was recalled to testify. He stated that the list of charges appearing on the invoice, the total of the dutiable and nondutiable charges being 18,509.25 pesos, included 10,900 pesos as aforo tax, and that he made that declaration showing such charges in connection with the export out of Mexico and the import into the United States. In addition thereto, he paid some additional money which was not on the list; "I. paid them additional just like giving away," but the invoice included only the aforo, which was "the correct amount what they said."

When questioned concerning the so-called "mordida," the petitioner stated that he had paid *"lots of Mordida,"* [italics supplied] but he did not put it on the invoice, "As Mordida, I include that on the value of the chewing gum." On cross-examination, the witness further testified in that regard:

X Q.· You always paid Mordida?—A. Always. That is the custom.

X Q. It is part of your exportation? It is part of your business?—A. We can't stop that.

\* \* \* \* \* \* \*

X Q. Did you have an export license from Mexico City to export this chewing gum? Did you have an export permit?—A. Yes, once I have permit.

X Q. You didn't have it when you made this shipment?—A. Sometimes they give us permit and we pay Mordida for it, and sometimes they don't give it. Once they didn't give it, and I asked the administrator of the Customhouse. I said if we can't get license to export from Mexico to the United States, then we smuggle it by some other way, against the law in the United States. He said, "We don't care what you do in Mexico, only we want here in the United States to come in legally by the law." I said, all right.

\* \* \* \* \* \* \*

X Q. So in order to get this merchandise out of Mexico, you had to pay a Mordida for this merchandise, Hidalgo chewing gum?—A. Yes.

X Q. You had to pay a Mordida?—A. Besides the export tax.

The witness further testified that the Mexican customs officer told him that he [the customs officer] had the permit and that he would fix the matter up with the Mexican customs; that he [the witness] paid him the 10,900 pesos, and the Mexican official passed it through the customs. He had no means of knowing what the official did with the money.

The witness further testified that he was not informed as to the reason the merchandise had been previously rejected. He thought it was because the boxes were wet. For that reason, he repacked the merchandise removing the wet packages and discarding them. When he replaced the wet merchandise with new goods, he again sent it back to the United States. The merchandise here in question, or at least part of it, had been a part of two different shipments previously rejected.

It was conceded that the word "mordida" means "bribe," but it is significant that the word "mordida" [mordido] translates into English as: "Bit, mouthful of meat," and in accordance with the use to which the word is put, it appears to be some vernacular form of the Spanish words "morder" meaning "to bite," or "mordedor" meaning "biter, one who bites." Considering the record as a whole, it appears convincing that the "mordida" was not a gratuitous payment by the party seeking the export permit, but was more in the nature of a demand or "bite" made by the Mexican customs official as "his commission."

From a careful consideration of the evidence in this case, it is at once apparent that the Government lays great stress upon the fact that this gum had been previously rejected from the United States upon two different occasions prior to the importation in question and that the petitioner had persisted in endeavoring to enter it into this country by trying to enter it through other ports of entry. The question before this court is whether or not the petitioner in making entry attempted to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise by including among the nondutiable charges under the name of an export tax the money demanded and paid to Mexican officials in order that he be allowed to make the exportation. The only reason appearing why the United States customs officials added back an apparently deductible nondutiable charge to increase the value of the merchandise was that they did not consider that it had been paid as an export tax.

The reason given by the examiner why additional duties accrued and the United States customs authorities had refused to remit or refund such additional duties assessed is not clear. Under section 489 of the Tariff Act of 1930 it is stated that:

* * * Such additional duties shall not be refunded in case of exportation of the merchandise, nor shall they be subject to the benefit of drawback. * * *

One might conclude from the foregoing that upon the exportation of merchandise, or in case merchandise was refused entry, any sum assessed as additional duties "shall not be refunded," irrespective of whether or not this court decided that the appraiser's report of fraud was well founded. However, section 489 relative to the foregoing has been construed by the Court of Customs and Patent Appeals in the case of *Les Parfums de Molyneux* v. *United States*, 26 C. C. P. A. (Customs) 323, C. A. D. 36, where the court, after reviewing the legislative history of the section, referred to that part of the section which stated:

\* \* \* Such additional duties shall not be construed to be penal and shall not be remitted nor payment thereof in any way avoided, except in the case of a clerical error, upon the order of the Secretary of the Treasury, or *in any case* upon the finding of the United States Customs Court, upon a petition filed \* \* \* [Italics not quoted.]

The court construed the section prohibiting refund as follows:

\* \* \* The phrase "in any case" is certainly broad enough to include cases in which the merchandise is exported, and the allowance of remission or refund of additional duties in cases of exportation where no regular duties are collected is not inconsistent with the policy of allowing such remission or refund in cases of nonexportation. Indeed, all things considered, there would seem to be as strong, if not stronger, reason for allowing these in cases where the goods do not, in fact, enter into domestic commerce, than in cases where they come into competition with domestic articles. *The provision prohibiting refund in cases of exportation, of course, is in effect where the importer fails to present the required evidence of good faith as defined by the statute.* [Italics not quoted.]

It thus appears that this court only is authorized to grant refund in such case.

The question of fact upon which this case turns is whether or not the sum of 10,900 pesos, appearing on the invoice as an aforo tax, was actually paid as an aforo tax as claimed by the petitioner or as a "mordida" as claimed by the respondent.

The petitioner testified that the 10,900 pesos was paid as an aforo tax, and that he paid a "mordida" independent from and in addition to the aforo tax. The witness labored under some language difficulties, but the writer of this opinion had the advantage of observing the witness during some of his testimony and feels convinced of the fact from the evidence produced that the witness is sincere in his belief that he paid both an aforo tax and a "mordida" and that the controversial 10,900 pesos were actually paid as an "aforo tax."

Although this court is shocked to learn that the so-called "mordida" or bribe is apparently customary in Mexico, nevertheless, we are unable to find from the evidence that the petitioner made any attempt to defraud the revenue of the United States or to conceal or misrepresent the facts or to deceive the appraiser as to the value by deducting upon entry a sum paid by him as a bribe in the guise of an export tax.

We find that the petitioner has supported by satisfactory evidence that the entry of the merchandise at a less value than that returned upon final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise.

Judgment will therefore be entered in favor of the petitioner, granting the petition.